# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID MELSON )<br>17901 Merino Drive )<br>Accokeek, MD 20607 )<br> )<br>    Plaintiff, )<br> )<br>    v. )<br> )<br> )<br> )<br>Dirk KEMPTHORNE, Secretary ) | Civil Action No._____<br><br><br><br>COMPLAINT<br>[Demand for Jury Trial] |

U.S. Department of the Interior        U.S.
DEPARTMENT OF THE INTERIOR,                    )

National Park Service NATIONAL PARK SERVICE,            )
)
                Defendant.        )
                                )

## COMPLAINT

Plaintiff David Melson by and through undersigned counsel, and for purposes of filing this civil complaint, states as follows:

## NATURE OF COMPLAINT

This is an action for monetary damages against the Department of the Interior ("Department") for injuries suffered by Mr. Melson during the course of his employment at the Department as a result of unlawful discrimination, harassment and retaliation against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.

## JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.

2.    Venue is proper in the District Court for the District of Columbia because this judicial district has jurisdiction over the Defendant. .

## PARTIES

3.    David Melson (hereinafter "Plaintiff") is an African-American male, employed by Defendant in the Maintenance Division of the National Park Service within the Department of the Interior. At all times relevant to the complaint, plaintiff was employed by the Department.

4.    The Department of the Interior is a United States Federal Government agency headquartered in Washington, D.C.

5.    William Gibson is a Caucasian male employed by Defendant, who served as Melson's direct or indirect supervisor at all relevant times herein described.

6.    Samuel Nichols is a Caucasian male employed by Defendant, who served as Gibson's immediate supervisor, and as Melson's second-level supervisor.

## STATEMENT OF FACTS

7.   Plaintiff is by experience and training a mechanic.

8.    Plaintiff started to work in the Sheet Metal Shop in April 1995 and shortly thereafter, Gibson commented to Melson that there are only 13% blacks in this country and there are so many more employed by the federal government; the blacks have had their turn and it's our turn now; and that nothing good is going to happen for him at the job.

9.    Plaintiff performed his work in the shop, but Gibson would not allow him to install his work in the field.

10. Gibson permitted the white employees to install Melson's work in the field.

11.  On or about October 1997, Melson constructed a copper cupola for the rededication of Anacostia Park, but Gibson would not allow him to install it without Robert Whittmore, a white employee, present.

12. In May 1998, Gibson put the "A-1 Guard Booth Project" at the White House on hold and would not let Melson perform the job because Whittmore was not available.

13. When Melson became aware that Gibson let white employees take credit for his work, he talked with Samuel Nichols, who praised his talent and skill, but told him that he was "too gifted for the operation and that [he] should leave."

14. Nichols assured Melson that he would be a supervisor one day, but that it would not be under Gibson's supervision, and encouraged him to leave.

15. Melson requested a short leave of absence to and to consider other options, but Gibson denied the leave.

16. In addition to making demeaning comments about African-Americans, Gibson also treated African-Americans employees less favorably.

17. On or about September of 1998, a team of African-American employees, including Melson, worked on a project to construct and install the first two Vehicle Barriers at the White House. After the completion of the project Gibson did not permit the African-American employees to have their pictures taken with the White House officials. Gibson permitted three Caucasian employees—Whittmore, Zurlo, and Valentine Anan who had worked on the project for less than one hour to have their pictures taken.

18. On or about April 2001, the White House requested a stainless steel cappuccino shelf. Gibson refused to send Melson and assigned the project to Whittamore who became ill; he then assigned Zurlo who was not trained to do the work despite efforts to train him by Melson. After four months, the White House pressured the agency about the project. Gibson finally assigned it to Melson who completed it in three days as required by Gibson.

**Defendant's Refusal to Promote Based on Race**

19. Gibson commented to Melson, "We've had black supervisors here before who were promoted over Whites because of Affirmative Action and that was not right."

20. On ___August 27, 2001 a supervisor position in Gibson's division was advertised.

21. Gibson tried to hide the announcement from Melson, but he was informed about the position by coworker.

22. On or about September 14, 2001, Melson submitted his application for the position as a supervisor under Gibson.

47. Rather than consider Melson as a candidate, Gibson tried to return the job certification as unfilled, and proposed a reorganization plan to eliminate the position.

48. Gibson taunted Melson about his application and told him that several less qualified Caucasian employees would be promoted over him.

49. However, Melson was rated number one on the Best Qualified Lists by both the U.S. Department of Interior and the Office of Personnel Management.

50. Because of Melson's rating on both lists, Superintendent Arnold Goldstein and Chief of Maintenance William Newman wanted to know why Melson was not being promoted.

51. Gibson and Nichols could not give a satisfactory reason for not promoting him, so Goldstein selected Melson for the supervisor position.

52. Even after Melson was selected for the position, Gibson and Nichols refused to sign the certification to officially promote Melson to the position.

53. After a long delay by Gibson and Nichols, Goldstein and Newman signed the certification to promote Melson.

**Defendant's Retaliation Against Melson for Being Promoted**

54. Once Melson was promoted to supervisor, Gibson intentionally created a hostile work environment for Melson by making it difficult for him to perform his role as supervisor, and continued to treat him less favorably than the White supervisors based on his race.

55. On or about April 2002, Gibson withdrew Melson's request for a surplus truck, which had been approved by Chief of Maintenance Newman.

56. Gibson approved a new truck for Donald Meyers, a Caucasian supervisor at Melson's level.

57. On or about June 2002, Melson designed and installed three metal well covers for the U.S. Park Police. Gibson insisted the well covers needed to be redesigned and destroyed them.

58. On or about February 12, 2004, Gibson tried to stop delivery of a stainless steel cabinet counter Melson had designed for the White House.

59. By stealing and removing hardware and accessories Melson purchased to complete the job, Gibson tried to sabotage delivery of a stainless steel counter, sink, and shelf unit that Melson had designed for the U.S. Park Police on or about October 2004.

60. Gibson repeatedly changed the times Melson submitted certifying the time worked by his employees. Melson contacted HR officials who instructed him to

certify his times directly in the system rather than submitting them to Gibson.  By doing so, Melson was able to ensure accurate time records for the employees under his supervision.

61. On or about August 2004, Gibson and Nichols tried to intimidate and embarrass Melson by verbally attacking him so loudly that other employees in the facility heard them. Gibson and Nichols admonished him for contacting administration, falsely accused him of not completing his work assignments, defying orders, and not being a "team player formal complaint in August 2004 for continuous harassment discrimination.

62. Melson filed a formal complaint in August 2004 for continuous harassment discrimination. Gibson and Nichols were aware of Melson's complaint.

63. After Melson filed the complaint, Nichols warned him that Gibson's anger and bitterness had reached an unhealthy level.

64. While working overtime on the Meridian Hill Globe Project, in October 2004, Gibson told Fred Williams, an African-American employee, that he was "prejudiced" against African Americans; that he hated Melson in particular, and wanted to "take [Melson] outside and beat him"; and that Melson had better "watch his back."

65. On another occasion, Gibson told Christopher Munson, an African-American employed by Defendant, on several occasions that if he had his way, he would beat up Melson.

66. Gibson told Melson, Williams and Oscar Seegers, another African-American employee, that he was racially "prejudiced," that he was "raised that way," and that he was "not going to change."

67. On yet another occasion, Gibson admitted to Munson, Williams, Seegers and Melson that he had a general "problem with black people," that he was raised that way, and that he "hates Melson with a passion."

68. Disturbed by Gibson's threatening comments about Melson, Munson, Williams and Jerome Hawkins, another African-American employee, warned Melson to "watch [his] back."

69. Melson was assigned a workshop area which he kept clean and organized, but Gibson complained that he kept his work area "too clean."

70. Gibson instructed employees to put various items in Melson's workshop area.

71. A few weeks before June 2005, Melson found a stage in his shop area and was told by Donald Myers, a Caucasian supervisor in Gibson's shop, that he had it put there. Melson complained that it was unsafe for employees and had it removed.

72. On or about June 1, 2005, Meyers ordered Robert LaChance, a Caucasian employee, to put a large door in Melson's work area, blocking his equipment. Melson objected and LaChance removed the door only after Myers told him to.

**Hangman's Noose**

73. On June 2, 2005, John Carrasco, employed by Defendant and under Myers's supervision placed a hangman's noose over Melson's door, the only African American supervisor. Carrasco is a White Hispanic male.

74. Carrasco initially claimed that he was playing with a rope, went to the bathroom, and found the noose hanging above Melson's office when he returned.

75. Carrasco then claimed that he was playing with the rope and it accidentally landed above Melson's door.  The noose could not have remained in place without some additional support.  Melson's office has a very thin plywood roof, and the ceiling of the building has a series of steel trusts that support the roof, but are detached from Melson's office.  Whitaker, Munson, Anthony Vick, and Gary Sturdivant, African-American males employed by Defendant, saw the hangman's noose over Melson's office and observed that it was secured by an additional object to hold it in place.

76. Tracy Przystas and William Watsak, two Caucasian employees not under Meyer's supervision, observed Carrasco hanging the noose over Melson's door.

77. Later, Carrasco admitted that he hung the noose, but claimed it was "just a joke."

78. Meyers and Gibson were both present in their offices when the noose was being hung.  Gibson's office almost directly faces Melson's office.

79. Gibson's front office wall has large picture windows and several slots, allowing him to see and hear what goes on in the shop.  The front of Melson's office is plainly visible through Gibson's office.

80. Meyer's office is adjacent to Melson's office, separated by a thin plywood petition.  From Meyer's office, he could see through both his and Melson's front window.

81. Munson observed the hangman's noose in shock and contacted Whitaker who was the union steward.

6

82. Whitaker tried reporting the noose to agency management but was met with indifference and brushed aside. Whitaker then called the Park Police and reported the incident.

83. Carrasco tried to take the noose down, but Whitaker asked him not to disturb the noose because it was evidence of a hate crime and that he was calling the Park Police.

84. While Whitaker was calling the police, Carrasco grabbed the noose and proceeded to untie it.  Whitaker asked him several more times to leave the noose alone.  Whitaker and Carrasco became engaged in a "tussle."  Carrasco punched Whitaker in the jaw. Meyers came out of his office, ordered Whitaker to get off of Carrasco, and grabbed Whitaker.

85. When the Park Police arrived in response to Whitaker's call, they began by asking Carrasco whether he had been assaulted.

86. All of the investigating Park Police officers were Caucasian males.

87. Among the officers leading the investigation was Robert LaChance, Jr., the son of Robert LaChance, Sr., who had put the door in Melson's work area the day before.  During the investigation, Officer LaChance consulted with his father about what happened.

88. The Park Police turned the case over to the Federal Bureau of Investigation which assigned it number 44B-WF-232494 and noted it as a hate crime, but did not investigate it.

89. When Melson came to work the next day, June 3, 2005, he was informed of the noose incident, and he found the remnants of the rope on his desk next to his office door.  Even though the noose had been untied, Melson observed that the rope retained the shape of a hangman's noose.

90. At the supervisors' meeting on June 3, 2005, Gibson stated that the matter should be handled inside the Metal Craft Shop.  Gibson stated that Carrasco's hanging the noose was an accident or a "joke", and that Carrasco did not know the meaning of a hangman's noose.  Gibson also added, "and if you are going to do something like hang a noose you do it at night time, so there are no witnesses around."

91. Both Whitaker and Carrasco were placed on a one-day administrative leave as a cooling off period.  When Whitaker returned to work, he was restricted from certain areas, including the cafeteria, but no restrictions were placed on Carrasco.

92. Thereafter, Melson was diagnosed with severe generalized anxiety disorder, and has been on extended leave, incurring thousands of dollars in medical bills for doctor's visits and prescription medications.

93. Melson had no prior history of mental illness.

94. While Melson was away on leave during the week of October 10, 2005, Gibson broke into and vandalized one of Melson's private storage areas with a pry bar.

95. On November 1, 2005, Vick called Melson to inform him that Gibson had ordered him to remove all the locks belonging to Melson.

96. Gibson claimed that the locks were not government issued despite the fact that the locks were MEDCO locks used throughout the Federal Government and at the facility.

97. Melson insisted that Gibson had keys to all of his locks except those with his personal tools and files. Melson was required to return to the facility because Gibson claimed he needed access to Melson's personal tool cabinet to complete his work.

98. Melson was on extended leave due to his medical condition, but drove the thirty miles from his home and opened the locks. He asked Gibson what he needed and Gibson said, "Maybe some nuts, bolts, and anchors." These items were stored next to Melson's cabinet, which everyone had access to.

**Retaliatory Decreasing and Not Granting Awards**

99. Following the noose incident in 2005, Melson nominated each of the employee's under his supervision for an award of $1,200.

100. During a supervisor's meeting in September 2005, Gibson announced that no one involved in the noose incident would receive an award that year.

101. Melson, Vick, Sturdivant, Whitaker and Munson were all involved in the noose incident, and they did not receive an award.

102. Melson's employees received substantially reduced awards, but Melson was not allowed to reduce the awards or exercise other award options as other supervisors.

103. Carrasco, who hung the noose, received an award without any reduction.

**Administrative Posture**

8

104.     Plaintiff Melson filed an informal EEO complaint on June 29, 2007, after the noose incident.

105.     .Plaintiff Melson filed a formal complaint on October 18, 2005, which was assigned Docket Number FNP-2006-005.

106.     In September 2006, Plaintiff requested a hearing at the EEOC.

107.     On November 6, 2006, Plaintiff withdrew his complaint from EEOC to return to the agency for its action. At the time of filing this complaint, Defendant has not adopted the action by EEOC or issued a final decision.

108.     Plaintiff has fulfilled the administrative prerequisites for seeking relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et. seq.* It is more than 180 days since Plaintiff Melson filed his charge of discrimination, and he is entitled to pursue his claim in court.

## Notice

109.     Defendant was made aware of Gibson's discriminatory treatment of Melson prior to, during the course of, and after Melson's promotion to supervisor, but failed to take any action to stop the continued discrimination, retaliation, and harassment by its subordinates Gibson or Nichols.

110.     As early as 1998, Melson notified Nichols of Gibson's discriminatory treatment and tried to resolve the matter, but Nichols told him that he would never be promoted to supervisor because of his race and that he should leave. Nichols took no action against Gibson.

111.     Prior to applying for the supervisor position in 2001, Melson had discussions with Defendant's management officials about the discriminatory treatment. Defendant did intervene to permit Melson to be promoted, but took no disciplinary action against Gibson or Nichols.

112.     Following Melson's promotion, Defendant was made aware of its subordinates continued discriminatory harassment and retaliation against Melson when Gibson intervened in the certification of the time sheets of employees under Melson's supervision; and when Melson filed a complaint against Gibson and Nichols for creating a hostile work environment by their verbal harassment in August 23, 2004. Defendant took no measures to remedy or even address the problem.

113.     When the hangman's noose was discovered, Defendants response was inadequate and conveyed a clear message that it condoned Carrasco's actions. Gibson and Nichols tried to handle the matter internally claimed that Carrasco did not know what the noose meant.

114.      When the Park Police came to the facility to investigate the hangman's noose, the all white team began the investigation by accusing the African-American witness who reported the incident of assault, but changed the charge to disorderly conduct.

115.      Even when higher level officials within the agency got involved, nothing was done to address the hangman's noose.

**116.**      Even while Melson was on medical leave, he was harassed by Gibson who required him for no good reason him to report to the shop to open the locks on his lockers.

## COUNT I – RETALIATION

117.      Plaintiff incorporates the allegations of paragraphs 1-121 herein by reference.

118.      Defendant is a federal employer of Plaintiff within the meaning of Section 717.

119.      Plaintiff Melson is an African-American employee of Defendant.

120.      Gibson and Nichols did not want Melson to be a supervisor because of his race, and they retaliated against him during his successful efforts to obtain the position by creating a hostile work environment.

121.      Ever since Melson applied for the position of supervisor in September 2001, Defendant—through Gibson, Nichols and their subordinates—retaliated against Melson for his efforts to have a work place free of race discrimination in his promotional opportunities, for his participation in the agency EEO process, and for his complaints of the hang man's noose.

122.      Defendant retaliated against Melson by creating, maintaining and exacerbating a hostile work environment in which Gibson and Nichols made it more difficult for Melson to perform his duties as a supervisor compared to similarly situated Caucasian supervisors.

123.      In response to their ongoing and continued harassment, Melson filed an EEO complaint against Gibson and Nichols, which is a protected activity under civil rights laws.  After Melson filed the complaint, Gibson and Nichols created an even more hostile work environment for Melson by threatening him, as well as by directing and encouraging other employees to harass Melson by placing various objects in his office and work space.

124.     Defendant retaliated by creating a hostile work environment where its employee found it acceptable to place a hangman's noose over Melson's office door.

125.     Carrasco created a *per se* hostile work environment for Melson and all Defendant's African-American employees by hanging the noose over Melson's office.

126.     Carrasco did not place the hangman's noose above Melson's office by accident, or as a joke, but rather as a result of the hostile work environment created by Gibson and Nichols and in retaliation against Melson for being promoted as a supervisor, and for his EEO activity.

127.     On June 2, 2005, the day the noose was discovered, Defendant ordered both Whitaker (reported the noose) and Carrasco (hung the noose) to take a one-day administrative leave.  When Whitaker returned to work he was restricted his electrical shop, but Carrasco had no restriction placed on him.

128.     Even after Carrasco's retirement, Vick and Whitaker observed Carrasco visiting the facility, which made Melson and other African-Americans uncomfortable.

129.     Defendant did not give awards to any employees involved with the hangman's noose, but Carrasco, who hung the noose, received an award.

130.     Defendant reduced the awards that Melson recommended for the employees under his supervision as retaliation against him for engaging in protected EEO activity (noose).

### COUNT II – HARASSMENT/HOSTILE WORK ENVIRONMENT

131.     Plaintiff incorporates the allegations of paragraphs 1-135 herein by reference.

132.     Defendant—through Gibson, Nichols and their subordinates—created an ongoing, race-based hostile environment to the detriment of Melson from the moment he applied to be a supervisor in 2001; continued through when Melson had to file a complaint of harassment on August 23, 2004; was heightened in July 2005 because of the hangman's noose, which forced him to take medical leave as a result of the hostile work environment and filed another complaint against Defendant in October 2005.

133.     Gibson regularly treated African-American employees less favorably than Caucasian employees in *inter alia*, assignments, awards, time certification, and recognition.

134.     Gibson often made derogatory racial remarks about African-Americans.

135.     Gibson and Nichols made clear that they would not promote Melson as a supervisor because of his race, refused to consider his application, and actively tried to prevent his promotion.

136.     Melson is Defendant's only African-American supervisor, working under Gibson's supervision.

137.     Once Melson became a supervisor, Gibson and Nichols tried to undermine his ability to perform his duties by changing the time certifications for his employees, and verbally attacking him so loudly that other employees heard them.

138.     Gibson denied Melson a surplus vehicle approved by the Chief of Maintenance in April 2002, and approved a new vehicle for a Caucasian supervisor a few months later.

139.     Gibson actively interfered with or impeded Melson's ability to complete his work by destroying three metal well covers Melson designed in June 2002.

140.     Gibson refused to assign Melson to work on projects at the White House and other high profile jobs, and in February 2004, he tried to prevent Melson from delivering a stainless steel cabinet and counter to the White House.

141.     From September to October 2005, Gibson made several verbal threats against Melson directly and through other employees.

142.     Gibson vandalized Melson's personal space and attempted to remove all of the locks in Melson's office as part of his continued harassment of Melson.

143.     In 2005, Defendant, though Gibson and/or Nichols had certain white employees put a stage and a door Melson's work area to harass him.  Gibson and Nichol's open disrespect and harassment of Melson created a hostile work environment, which set the tone for white employees in their treatment of Melson.

144.     As a result of Defendant's severe, ongoing, and pervasive harassment discrimination, Melson suffers from severe generalized anxiety disorder, has had to take extensive leave, and continues to take prescription medication and consult with a physician to cope with the effects of such treatment.

145.     Melson has been harmed professionally, mentally, emotionally, and financially.

146.       The hangman's noose, and the subsequent inadequate response by Defendant to the incident, created a *per se* hostile work environment for Melson and all of Defendant's African-American employees.

## JURY DEMAND

147.       Plaintiff hereby demands a trial by jury of the applicable claims raised herein.

## PRAYER FOR RELIEF

148.       WHEREFORE, Plaintiff prays this Court to:

149.       Find that Defendant engaged in willful and intentional retaliation against Melson based on his race by not giving him an award, but giving an award to the employee who hung the noose and for his activity in advocating for his employment rights causing Melson pain, suffering, inconvenience, mental anguish, loss of enjoyment of life loss of weight, loss of sleep, and loss of consortium;

150.       Find that Defendant wrongfully lowered the monetary awards submitted by Melson on behalf of the employees under his supervision;

151.       Find that Defendant harassed Plaintiff Melson and created a hostile work environment, which adversely impacted his ability to perform his duties as a supervisor;

152.       Restore Melson's sick leave, annual leave, and borrowed leave and all other uncompensated leave taken as a result of the matters described herein;

153.       Enjoin the Defendant from engaging in the same or like practices against African-Americans in the future by implementing measures to monitor and penalize non-enforcement of existing agency nondiscrimination policies;

154.       Enter judgment awarding the Plaintiff back pay, other loss of income, loss of retirement and health benefits, and other make-whole relief to be determined after trial;

155.       Award compensatory damages in amount to be determined by the jury after trial;

156.       Award to the Plaintiff the costs of litigation including reasonable expenses, attorneys' fees, and expert witness fees; and

157.       Provide such other relief as the court deems just.

14

Respectfully submitted,

_____
James McCall, Esq.
D.C. Bar No. 326652
E. Ned Sloan, Esq.
D.C. Bar No. 455198
SLOAN & ASSOCIATES, PLLC
7600 Georgia Avenue N.W.
Suite 208
Washington, DC 20012
Phone: 202.829-0886
Fax:    202.829-4249
Attorneys for Plaintiff

*H 08-287 CKK* (handwritten)

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

*David Melson* (handwritten)

*88888* (handwritten)

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES) *88888* (handwritten)

## DEFENDANTS

*Dirk Kempthorne, secretary of the Department of the Interior* (handwritten)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES. USE THE LOCATION OF THE T

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

*Sloan & Associates, PLLC 7600 Georgia Av. NW Suite 208 Washington DC 20012* (handwritten)

Case: 1:08-cv-00287
Assigned To : Kollar-Kotelly, Colleen
Assign. Date : 2/20/2008
Description: Employ. Discrim.

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

□ 1 U.S. Government Plaintiff

□ 3 Federal Question (U.S. Government Not a Party)

(x) 2 U.S. Government Defendant

□ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | x 1 | x 1 | Incorporated or Principal Place of Business in This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### □ A. Antitrust

□ 410 Antitrust

### □ B. Personal Injury/ Malpractice

□ 310 Airplane
□ 315 Airplane Product Liability
□ 320 Assault, Libel & Slander
□ 330 Federal Employers Liability
□ 340 Marine
□ 345 Marine Product Liability
□ 350 Motor Vehicle
□ 355 Motor Vehicle Product Liability
□ 360 Other Personal Injury
□ 362 Medical Malpractice
□ 365 Product Liability
□ 368 Asbestos Product Liability

### □ C. Administrative Agency Review

□ 151 Medicare Act

Social Security:
□ 861 HIA ((1395ff)
□ 862 Black Lung (923)
□ 863 DIWC/DIWW (405(g)
□ 864 SSID Title XVI
□ 865 RSI (405(g)

Other Statutes
□ 891 Agricultural Acts
□ 892 Economic Stabilization Act
□ 893 Environmental Matters
□ 894 Energy Allocation Act
□ 890 Other Statutory Actions (If Administrative Agency is Involved)

### □ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### □ E. General Civil (Other) OR □ F. Pro Se General Civil

Real Property
□ 210 Land Condemnation
□ 220 Foreclosure
□ 230 Rent, Lease & Ejectment
□ 240 Torts to Land
□ 245 Tort Product Liability
□ 290 All Other Real Property

Personal Property
□ 370 Other Fraud
□ 371 Truth in Lending
□ 380 Other Personal Property Damage
□ 385 Property Damage Product Liability

Bankruptcy
□ 422 Appeal 28 USC 158
□ 423 Withdrawal 28 USC 157

Immigration
□ 462 Naturalization Application
□ 463 Habeas Corpus- Alien Detainee
□ 465 Other Immigration Actions

Prisoner Petitions
□ 535 Death Penalty
□ 540 Mandamus & Other
□ 550 Civil Rights
□ 555 Prison Condition

Property Rights
□ 820 Copyrights
□ 830 Patent
□ 840 Trademark

Federal Tax Suits
□ 870 Taxes (US plaintiff or defendant

□ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
□ 610 Agriculture
□ 620 Other Food &Drug
□ 625 Drug Related Seizure of Property 21 USC 881
□ 630 Liquor Laws
□ 640 RR & Truck
□ 650 Airline Regs
□ 660 Occupational Safety/Health
□ 690 Other

Other Statutes
□ 400 State Reapportionment
□ 430 Banks & Banking
□ 450 Commerce/ICC Rates/etc.

□ 460 Deportation
□ 470 Racketeer Influenced & Corrupt Organizations
□ 480 Consumer Credit
□ 490 Cable/Satellite TV
□ 810 Selective Service
□ 850 Securities/Commodities/ Exchange
□ 875 Customer Challenge 12 USC 3410
□ 900 Appeal of fee determination under equal access to Justice
□ 950 Constitutionality of State Statutes
□ 890 Other Statutory Actions (if not Administrative Agency Review or Privacy Act)

*(3)* (handwritten, circled)

| ☐ G. *Habeas Corpus/ 2255*  ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☒ H. *Employment Discrimination* ☒ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | ☐ I. *FOIA/PRIVACY ACT* ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act) *(If pro se, select this deck)* | ☐ J. *Student Loan* ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| ☐ K. *Labor/ERISA (non-employment)* ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ L. *Other Civil Rights (non-employment)* ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities-Employment ☐ 446 Americans w/Disabilities-Other | ☐ M. *Contract* ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ N. *Three-Judge Court* ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ Multi district Litigation  ☐ 7 Appeal to District Judge from Mag. Judge

42 U.S.C. 2000e  Employment discrimination, Retaliation, harassment

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS  ☐  ACTION UNDER F.R.C.P. 23  DEMAND $  Check YES only if demanded in complaint  JURY DEMAND ☒ YES  ☐ NO

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  ☐ YES  ☐ NO  If yes, please complete related case form.

DATE  2·20·08  SIGNATURE OF ATTORNEY OF RECORD  *E- Ned Sloan*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd